CORRECTED

# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 21-396V

| | |
|---|---|
| WILL GALLAWAY,<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Chief Special Master Corcoran<br><br><br>Filed: April 28, 2025 |

*David John Carney, Green & Schafle LLC, Philadelphia, PA, for Petitioner.*

*Austin Joel Egan, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On January 8, 2021, Will Gallaway filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that he suffered a right shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered to him on October 25, 2019. *See* Pet. at 1, ECF No. 1; *see also* Am. Pet., ECF No. 6. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find it more likely than not that the subject vaccination was administered in Petitioner's right deltoid, and the onset of his shoulder pain occurred within 48 hours of vaccination, as alleged. I therefore find Petitioner entitled to compensation, and award **$58,000.00** in actual pain and suffering.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.    Relevant Procedural History

Following a medical review of this case, the parties attempted unsuccessfully to come to a settlement agreement. *See* ECF Nos. 23-29. Petitioner subsequently filed a motion for a ruling on the record and brief in support of damages on December 30, 2022. ECF No. 32. Respondent filed a response and brief in support of damages on February 1, 2023. ECF No. 34. On February 16, 2023, Petitioner filed a supplemental affidavit and a reply brief. ECF Nos. 35-36.

Before ruling on Petitioner's motion, I issued an Order to Show Cause stating that the record lacked preponderant support for Petitioner's allegation that he received the flu vaccine in his right, rather than left, arm. ECF No. 38. Additionally, I explained that Petitioner needed to further substantiate that his alleged SIRVA occurred in the timeframe specified for a Table SIRVA claim. *Id.* I ordered Petitioner to file any evidence pertaining to these issues before I rule on the pending motion for entitlement. *Id.*

In response to my Order to Show Cause, Petitioner filed several supplemental witness affidavits and a written brief addressing these critical issues. ECF Nos. 40-41. Petitioner's updated filings did not alter Respondent's position, however, and he filed a memorandum addressing Petitioner's newly filed evidence in March 2024. ECF No. 42. Petitioner filed a supplemental response thereafter. ECF No. 44. This matter is now ripe for consideration.

## II.    Relevant Factual Evidence[3]

### A.  Contemporaneous Medical Records

Petitioner's medical history is relevant for osteoarthritis, bilateral knee problems, left shoulder pain, and neck and back pain, for which he regularly attended physical therapy ("PT"). *See,* e.g., Ex. 3 at 16. On October 25, 2019, during a visit with his primary care provider ("PCP"), Petitioner (then 61 years old) received a flu vaccine in his left deltoid. Ex. 5 at 7. The vaccine consent form includes a sticker with the vaccine lot number, expiration date, and a handwritten "L" that is circled. *Id.* The entry appears as follows:



---

[3] Only those facts relevant to site of vaccination and onset will be discussed herein, although other facts may be included as necessary.

Petitioner thereafter had a number of medical visits over the next two months – during which he did not complain of shoulder-related symptoms. For instance, on October 30, 2019, Petitioner underwent an endoscopy with gastric biopsy. Ex. 1 at 60-61. Petitioner followed up with his PCP for depression on November 14, 2019. *Id.* at 48. He also had a bone density examination for his osteopenia on November 19, 2019. *Id.* at 41. More so, Petitioner visited his dermatologist on December 3, 2019, for a rash. *Id.* at 36. During the musculoskeletal review of systems, Petitioner reported "joint pain, but no weakness[.]" *Id.* Petitioner did not specify the site of this joint pain. *See id.*

On December 13, 2019 (now approximately seven weeks post-vaccination), Petitioner visited his PCP complaining of "right shoulder pain." Ex. 1 at 31. Petitioner reported that "[h]e got an influenza vaccine in October he believes in his right shoulder. Chart note says left shoulder." *Id.* And, "since that time[,] his right shoulder has been bothering him." *Id.* Petitioner described pain with movement but "no actual loss of range of motion [("ROM)]." *Id.* A physical examination showed that the right shoulder was "symmetric" to the left on palpation and the PCP could not "elicit any areas of tenderness." *Id.* at 32. Petitioner's right shoulder ROM was also "symmetric to the left." *Id.* The PCP opined that Petitioner had a "mild tendonopathy [sic]" but the treater was "not sure how or if it even correlates at all to the influenza vaccine." *Id.* at 31. The PCP recommended PT and a cortisone injection if PT was unsuccessful. *Id.*

Petitioner attended an initial PT evaluation for right shoulder pain on December 18, 2019. Ex. 3 at 13. The "injury/onset date" was listed as "10/18/2019 new injury, flu shot[.]" *Id.* Specifically, Petitioner reported "R [sic] shoulder pain that began immediately after getting a flu shot in Oct. [sic]." *Id.* He noted the "location of pain" as being in the right shoulder. *Id.* Petitioner rated his pain at a 0-8/10, with a current rating of 1/10. *Id.* The visit notes also reflect that Petitioner was right-handed. *Id.* An examination showed decreased active ROM, normal passive ROM, and slightly diminished right shoulder strength compared to the left. *Id.* at 13-14. Petitioner attended a total of four PT visits for his right shoulder (through January 13, 2020). *See id.* at 1-18.

After the conclusion of his treatment with PT, Petitioner returned to his PCP in February 2020 for evaluation of "right shoulder pain since October[.]" Ex. 1 at 9. Petitioner reported that his PT treatment "made no difference," and that he still experienced right shoulder pain. *Id.* A physical examination of the right shoulder was consistent with a positive empty can test and a grinding sensation "when his shoulder is just rotated through simple [ROM]." *Id.* at 10. The PCP noted that "surgery should be avoided" based on Petitioner's "other medical problems[;]" Petitioner received a cortisone injection in his right shoulder. *Id.* at 9.

During a June 1, 2020 visit with a treater in his PCP's office for an unrelated ailment, Petitioner reported that he "[h]ad received [an] intramuscular vaccine for influenza on 10/25/19 and subsequently developed ipsilateral shoulder pain." Ex. 4 at 45-46. The situs of the shoulder pain was not specified. *See id.* at 46. Likewise, Petitioner endorsed joint pain on examination, but he did not specify the site of this pain. *Id.* at 45.

Petitioner underwent an MRI of the right shoulder on July 15, 2020. Ex. 4 at 38-39. Petitioner's PCP contacted him regarding the results and stated that it showed a complete rotator cuff tear, for which additional PT was recommended. *Id.* at 38.

On July 29, 2020, Petitioner saw an orthopedist for "right shoulder pain." Ex. 4 at 24. He reported that "this started in October 2019 after receiving his flu shot." *Id.* He described the pain as "intermittent," worse with movement, and rated as an 8/10. *Id.* Petitioner did not endorse improvement of his pain with PT or his steroid injection. *Id.* Upon examination of his right shoulder, Petitioner showed tenderness on palpation, positive impingement signs, slightly diminished strength, and reduced ROM. *Id.* at 26. An examination of the left shoulder was largely normal. *See id.* Petitioner was assessed with a complete rotator cuff tear, impingement syndrome, localized osteoarthritis, and a SLAP lesion – all of the right shoulder. *Id.* at 27. The orthopedist recommended surgery to repair his rotator cuff tear. *Id.*

Petitioner followed up with his PCP for his right rotator cuff tear on August 21, 2020. Ex. 4 at 13. The PCP noted that it was likely safe (from a cardiovascular standpoint) for Petitioner to undergo surgery, and that if he did not he might face permanent deficits, although "he may be able to learn to live with out [sic] typical [ROM] or strength that he had before the injury." *Id.* After reading about the surgery and recovery, Petitioner was "not sure at all that he want[ed] to have surgery" and noted that "[t]he shoulder pain has been decreasing." *Id.* An examination was consistent with mild pain with palpation and limited abduction. *Id.* at 14. Petitioner did not opt for surgery and no other medical records have been filed.

**B. Affidavit Evidence**

In his first affidavit (authored on April 6, 2021), Petitioner generally attested that he received the vaccine in his right shoulder. Ex. 2 ¶ 2. He explained that "[u]pon receiving the influenza vaccine," he felt "sudden" pain at the injection site. *Id.* ¶ 10. The pain extended through the shoulder, "and the injection site was incredibly tender and painful to touch." *Id.* He "believed at the time that this pain was normal post-vaccination side effects and that it would be temporary" so he "decided to wait it out to see if the pain continued" but instead it worsened "[o]ver the next several weeks." *Id.* ¶¶ 10-11. Petitioner

stated that his ROM became "restricted and painful" during those weeks, and he therefore knew it was time to seek care. *Id.* ¶ 11.

In his supplemental affidavit, drafted in February 2023 (*after* Respondent had questioned situs and onset), Petitioner then "specifically remember[ed] getting the flu vaccine in [his] right arm on October 25, 2019." Ex. 6 ¶ 5. He described the circumstances of his receipt of the vaccine, and recalled that he was seated in a chair in the corner of the room, "so [his] left side was against the wall[.]" *Id.* The nurse then told Petitioner "that the paperwork she had marked [said] that [he] would get the vaccine in the left shoulder but asked if it mattered [] if she gave the shot in the right arm instead because of how the room was set up[;]" Petitioner agreed. *Id.* Additionally, Petitioner addressed his initial post-vaccination visits and explained that he did not mention right shoulder pain at these appointments because he "thought the pain was typical vaccine pain and was hopeful that it would go away on its own." *Id.* ¶ 6.

Petitioner submitted a second supplemental affidavit – drafted in January 2024 and in direct response to my Order to Show Cause (outlining the specific deficiencies in the record related to situs and onset). Ex. 7. Petitioner attested that he has "always known the vaccination was given in [his] right shoulder, however, [he] wasn't ever asked to address the specifics of what [he] remember[ed] regarding which arm was vaccinated." *Id.* ¶ 2. Regarding the onset of his injury, Petitioner stated that he did not mention right shoulder complaints at his October 30 and November 19, 2019 visits, for example, because they were for his liver issues and "this doctor was not the type that could help with [his] shoulder." *Id.* ¶¶ 4, 6. He stated the same reason for not bringing up shoulder complaints during his December 3, 2019 dermatology visit. *Id.* ¶ 7. And, Petitioner contended that he mentioned right shoulder complaints during his November 14th PCP visit but that his PCP "brushed it off and told [Petitioner] it would feel better with time and there was nothing he could do[;]" Petitioner trusted his medical opinion and hoped it would heal on its own. *Id.* ¶¶ 5, 9. Petitioner did not know why this conversation was not contained in the visit notes for that appointment. *Id.* ¶ 5.

Finally, Petitioner described general limitations in activities of daily living ("ADLs") caused by his right shoulder pain, including with sleeping and with his work as a maintenance engineer – which requires lifting heavy objects and resulted in modification of tasks. Ex. 2 ¶¶ 7, 11, 15-16, 20. He also explained that he can no longer pursue hobbies such as hunting and archery, which brought him joy and a connection to nature. *Id.* ¶ 17.

Petitioner's sister, with whom he works, also drafted an affidavit in 2024 (in response to my Order to Show Cause). Ex. 8 ¶¶ 2-3. She noted that she "was aware" that Petitioner had "a right shoulder injury after his October 2019 flu vaccine because when

he returned to work after getting it[,] he was holding his right arm weirdly." *Id.* ¶ 5. According to his sister, Petitioner told her that he received the vaccine in the right arm and that he experienced pain the same day. *Id.* She explained that "[o]ver the next few days," Petitioner was still experiencing pain in his right shoulder, and she witnessed him having difficulties performing tasks with his right arm thereafter. *Id.* ¶¶ 6-7.

Another one of Petitioner's coworkers submitted an affidavit in response to my Order to Show Cause. Ex. 9. According to this coworker, "after [Petitioner] got the vaccine he told [the coworker] how he shouldn't have gotten it in his right arm because it was hurting him so badly." *Id.* ¶ 5. This coworker attested that Petitioner told him how the administrator was "supposed to give his vaccine in his left arm but they ended up giving it to him in his right arm and he was upset about that since he was in so much pain." *Id.* Based on conversations with Petitioner regarding the pain he experienced "since" getting the vaccine, this coworker "chose not to get [his] flu vaccine that year[.]" *Id.* ¶ 6.

Finally, Petitioner's partner submitted an affidavit on his behalf (also drafted after issuance of my Order to Show Cause). Ex. 10. She explained that when Petitioner returned home from receiving the subject vaccine, he "started complaining about his pain right away." *Id.* ¶ 5. Petitioner described the circumstances of the shot to her and that he was "sitting against the wall in the exam room, so the nurse just quickly put it in his right arm instead of his left like he wanted[.]" *Id.* Petitioner's partner stated that he was "in a lot of pain that day that he got the vaccine, and his pain never went away." *Id.* She also described limitations in the use of Petitioner's right arm after his receipt of the subject vaccine, in that he "slowed down with basically everything[,]" including yardwork and crossbow hunting. *Id.* ¶¶ 6-7. No other affidavit evidence has been submitted.

## III. Fact Findings and Ruling on Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at \*20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at \*5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

I am resolving the fact disputes in question on the filed record. The Vaccine Act and Rules not only contemplate but encourage special masters to decide many matters on the papers where, in the exercise of their discretion, they conclude that doing so will properly and fairly resolve the issue. *See* 42 U.S.C. § 12(d)(2)(D); Vaccine Rule 8(d). Indeed, the decision to rule on the record in lieu of a hearing has been affirmed on appeal. *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020);

*Hooker v. Sec'y of Health & Hum. Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided cases on the papers in lieu of hearing and those decisions were upheld).

## A. Factual Findings Regarding Situs

The record preponderantly supports the conclusion that the flu vaccine was likely administered in Petitioner's right shoulder, as alleged. The record of his December 13, 2019 PCP visit for right shoulder pain present ever since receiving a vaccination in his right arm (Ex. 1 at 31), is particularly persuasive. This record was generated within seven weeks of the subject vaccination, and is the most contemporaneous record other than the vaccine administration record itself. Moreover, the record from this visit shows that Petitioner's PCP acknowledged that the vaccination "chart note says left shoulder" but the PCP proceeded to document right shoulder complaints – suggesting that the treater found Petitioner's right shoulder symptoms credible. And as the above-referenced medical records further establish, when seeking medical treatment on every occasion thereafter, Petitioner consistently reported right shoulder pain attributable to his flu vaccination. *See,* e.g., Ex. 1 at 9-10; Ex. 3 at 13; Ex. 4 at 24.

It is true that the vaccine administration record *itself* memorializes the site of the administration of Petitioner's flu vaccine as the left arm – with a handwritten circle of the notation "L." Ex. 5 at 7. While I routinely afford weight to a handwritten vaccination record,[5] it is not unusual for the information regarding situs of vaccination set forth in this kind of document to be incorrect – even if handwritten.[6] In many instances, the information regarding situs has been recorded prior to vaccination, but is not subsequently corrected to conform with the actual situs of vaccine administration.[7] Thus, although such records are unquestionably the first-generated documents bearing on the issue of site (and merit

---

[5] *Rizvi v. Sec'y of Health & Hum. Servs.*, No. 21-881V, 2022 WL 2284311, at *4 (Fed. Cl. Spec. Mstr. May 13, 2022); *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020).

[6] *See,* e.g., *Arnold v. Sec'y of Health & Hum. Servs.,* No. 20-1038V 2021 WL 2908519, at *4 (Fed. CL. Spec. Mstr. June 9, 2021); *Syed v. Sec'y of Health & Hum. Servs.,* No. 19-1364V, 2021 WL 2229829, at *4-5 (Fed. Cl. Spec. Mstr. Apr. 28, 2021); *Ruddy v. Sec'y of Health & Hum. Servs.*, No 19-1998V, 2021 WL 1291777, at *5 (Fed. Cl. Spec. Mstr. Mar. 5, 2021); *Desai v. Sec'y of Health & Hum. Servs.*, No 14-0811V, 2020 WL 4919777, at *14 (Fed. Cl. Spec. Mstr. July 30, 2020); *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020); *Stoliker v. Sec'y of Health & Hum. Servs.*, No. 17-0990V, 2018 WL 6718629, at *4 (Fed. Cl. Spec. Mstr. Nov. 9, 2018).

[7] In a recent ruling by another special master, the pharmacist who had administered the relevant vaccination actually testified that she inputs "left deltoid" into the computer system as a matter of course, without confirming the actual site of vaccination, based upon the assumption that most vaccinees are right-handed. *Mezzacapo v. Sec'y of Health & Hum. Servs.*, No. 18-1977V, 2021 WL 1940435, at *4 (Fed. Cl. Spec. Mstr. Apr. 19, 2021).

some weight as a result), they are not *per se* reliable simply because they come first. In fact, I have previously determined that the very nature of vaccination record creation provides some basis for *not* accepting them as the evidence worthy of highest probative weight. *See,* e.g., *Rizvi v. Sec'y of Health & Hum. Servs.*, No. 21-881V, 2022 WL 2284311, at *4 (Fed. Cl. Spec. Mstr. May 13, 2022).

Indeed, the vaccine administration record at issue here is a handwritten entry as to situs only, with typed entries for the other pertinent information (i.e., lot number, expiration date). While it is not so ambiguous as to completely undermine what it suggests about situs,[8] it is the *only* evidence in this case that supports a finding of left arm situs. When weighed against Petitioner's clear, consistent, and close-in-time reports to treaters of right shoulder pain following his receipt of a flu vaccine in that arm, his diagnostic testing, and his exclusive treatment for *right* shoulder symptoms, it does not defeat a finding that Petitioner received his October 25, 2019 flu vaccine in his right arm, as alleged. To rule otherwise, the overall record would need to contain more instances in which the counter-situs was suggested or supported.

Furthermore, Petitioner's affidavits provide some additional support for right arm situs. This is so even though most of the affidavit evidence submitted in this case was drafted after situs became a disputed issue (and my Order to Show Cause) – thus giving a reason to doubt the affiants' credibility. However, Petitioner's affidavit evidence bearing on situs contains a specific recounting of the circumstances of his vaccination that is consistent with what is known generally about vaccination records in the Program – that such entries are often recorded prior to vaccination and not corrected even if the vaccine was given in the opposing arm. *See Mezzacapo v. Sec'y of Health & Hum. Servs.*, No. 18-1977V, 2021 WL 1940435, at *4 (Fed. Cl. Spec. Mstr. Apr. 19, 2021). Indeed, Petitioner has attested that the nurse administering the subject vaccine told him "that the paperwork she had marked [said] that [he] would get the vaccine in the left shoulder but asked if it mattered [] if she gave the shot in the right arm instead because of how the room was set up." Ex. 6 ¶ 5. Thus, to the extent that Petitioner's affidavit is consistent with what is known about vaccination records in the Program, I will give such assertions some weight.

## B. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

---

[8] *Compare Toothman v. Sec'y of Health & Hum. Servs.,* No. 22-207V, 2024 WL 2698520 (Fed. Cl. Spec. Mstr. Apr. 19, 2024) (finding the vaccine administration record – supporting a contrary situs finding – was haphazardly completed, thus providing a reason to afford it less weight when compared to the bulk of the evidence).

### 1. Petitioner Has No Prior Right Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner meets this criterion, and there is nothing in the filed evidence to suggest otherwise.[9]

### 2. Onset of Petitioner's Injury Occurred Within 48 Hours of His Vaccination

A petitioner alleging a SIRVA claim must show that he experienced the first symptom or onset within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)), and that her pain began within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)). The aforementioned medical records, coupled with Petitioner's affidavits, establish that Petitioner consistently reported to treaters onset close-in-time to vaccination, that he sought treatment within a month and a half of his October 25, 2019 vaccination, and that he indeed was experiencing symptoms in the relevant timeframe. *See,* e.g., Ex. 1 at 31; Ex. 3 at 13; Ex. 4 at 45-46; *see also* Exs. 2, 6.

Respondent argues Petitioner cannot establish onset, in part because his earliest post-vaccination visit for shoulder symptoms occurred approximately seven weeks post vaccination, on December 13, 2019. ECF No. 34 at 8-9. More so, even though Petitioner described his shoulder pain as being "incredibly tender" since immediately post vaccination in his affidavit, that attestation is inconsistent with his initial physical examination (which failed to reveal shoulder tenderness), and his failure to report shoulder symptoms at his first *four* intervening post vaccination visits. *Id.* (citing Ex. 1 at 32; Ex. 3 at 14; Ex. 2).

The fact that Petitioner did not seek treatment for over one and a half months post vaccination (on December 13, 2019 – 49 days post vaccination), however, is not alone a basis for finding Table onset not to have been established. I have found in other cases that even *greater* delays did not undermine an otherwise-preponderantly-established onset showing consistent with the Table. *See,* e.g., *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018), *mot. for rev. denied,* 142 Fed. Cl. 329 (2019) (finding a 48-hour onset of shoulder pain despite a nearly six-month delay in seeking treatment); *Williams v. Sec'y of Health & Hum. Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting a delay

---

[9] Although Petitioner appears to have attended PT for several ailments pre vaccination (including *left* shoulder pain associated with osteoarthritis), I do not consider this pre-vaccination history detrimental to Petitioner as a result of my finding of right arm situs, here. *See,* e.g., Ex. 3 at 16 (a July 26, 2018 report of "pain through his left shoulder and also his low back over the years").

in seeking treatment for five-and-a-half months because a petitioner underestimated the severity of her shoulder injury). And it is common for SIRVA petitioners to delay seeking treatment, thinking the injury will resolve on its own, since patients are often told by medical providers at the time of vaccination to expect some soreness and pain for a period of time after. Also, the delay was not appreciably long – and the fact that treatment was sought in a relatively short timeframe is supportive of a close-in-time onset.

Likewise, the fact that Petitioner sought care on four occasions between the date of his vaccination and the December 13, 2019 visit (without mentioning shoulder symptoms) does not prevent a favorable onset finding. *See* Ex. 1 at 36, 41, 48, 60-61. Some of those appointments were with specialists or were for specific testing (i.e., an October 30, 2019 endoscopy and a November 19, 2019 bone density examination), and thus did not present occasions for Petitioner to report an unrelated problem. *See id.* at 41, 60-61. Admittedly, one of these visits (on November 14, 2019), was with his PCP – with whom it would have been reasonable for Petitioner to have complained of shoulder pain (especially if the pain was as severe as Petitioner alleges in his affidavit at that time). But I do not find Petitioner's omission of shoulder complaints at this visit to completely undermine his Table onset claim when considered against the bulk of the evidence. *Id.* at 48; Ex. 2 ¶¶ 10-11; Ex. 6.

Petitioner's December 3, 2019 dermatology visit – during which Petitioner mentioned general joint pain without describing right shoulder pain, specifically – also does not ultimately preclude a showing of 48-hour onset. *See* Ex. 1 at 36. Again, this visit was with a specialist, and Petitioner has offered some credible explanation for not mentioning shoulder-related complaints at this and other intervening visits (i.e., that he did not think this type of doctor could help, and he was hopeful that the pain would resolve on its own). *See,* e.g., Ex. 2 ¶¶ 10-11; Ex. 6 ¶ 6; Ex. 7 ¶ 7. I will note, however, Petitioner's ability to seek care for non-shoulder related issues during this time is somewhat inconsistent with his affidavit, wherein he describes shoulder pain affecting his ADLs and worsening by this time. Ex. 2 ¶ 7. This evidence is thus further supportive of the conclusion that Petitioner's SIRVA was mild – an issue that will go to damages.

Petitioner affirmatively and repeatedly linked his shoulder pain to the flu vaccine – beginning with the December 13th treatment encounter, at which time he noted that "[h]e got an influenza vaccine in October" and "*since* that time[,] his right shoulder has been bothering him." Ex. 1 at 31 (emphasis added). Other subsequent medical records also corroborate the contention made in Petitioner's affidavit that his pain likely began within 48 hours of vaccination. *See,* e.g., Ex. 3 at 13 (a December 18, 2019 PT report of

"shoulder pain that began immediately after getting a flu shot in Oct. [sic].")[10]; Ex. 1 at 9 (a February 20, 2020 PCP follow-up note of "right shoulder pain since October[.]"); Ex. 4 at 45-46 (a June 1, 2020 report that he "[h]ad received [an] intramuscular vaccine for influenza on 10/25/19 and subsequently developed ipsilateral shoulder pain."); Ex. 4 at 24 (a July 29, 2020 report of right shoulder that "started in October 2019 after receiving his flu shot."). Some of these medical entries include only a *general* temporal relationship between onset of his injury and his October vaccination. Yet, Petitioner consistently linked the two events. Petitioner's medical records thus provide preponderant support for a close-in-time onset.

Accordingly, and based upon the above, I find there is preponderant evidence that establishes the onset of Petitioner's right shoulder pain more likely than not occurred within 48 hours of vaccination, and thus within the Table timeframe.

### 3. Petitioner's Pain Was Limited to His Right Shoulder

The third requirement for a Table SIRVA is that the pain and limited ROM are limited to the shoulder in which the subject vaccination was administered. 42 C.F.R. § 100.3(c)(10)(iii). Respondent has disputed that Petitioner meets this criterion in so much as he had failed to show he received the subject vaccination in the injured, right arm. *See* ECF No. 34 at 7-8. I find this argument moot in light of my finding regarding situs and thus no further discussion of this criterion is warranted.[11]

### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent does not contend that Petitioner fails to meet this criterion, and there is not preponderant evidence in the filed record to suggest otherwise. I will note, however, that evidence of Petitioner's rotator cuff tear and osteoarthritis – while not precluding Petitioner from establishing a Table SIRVA claim *per se* – speaks to a lower

---

[10] Another entry for this visit lists the "injury/onset date" as "10/18/2019" – a week before the subject vaccination. Ex. 3 at 13. Still, despite the incorrect vaccination date, this entry describes the onset of Petitioner's right shoulder pain as being a "new injury" and linked to the "flu shot" – thus providing some added support for Table onset. *See id.*

[11] I emphasize that the crux of Respondent's argument regarding this criterion is *situs*, not the type of "localization of pain" arguments typically litigated with respect to this QAI requirement. *See,* e.g., *Kahler v. Sec'y of Health & Hum. Servs.,* No. 19-1938V, 2024 WL 1928451 (Fed. Cl. Spec. Mstr. Mar. 27, 2024) (addressing Respondent's argument regarding the third QAI criterion – that the petitioner's pain radiated to other areas of the upper extremity, including the hand, and was thus inconsistent with a SIRVA).

damages award, as Petitioner's vaccine injury was likely not the predominant factor in causing his symptoms.

### C. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c).

As stated above, the record shows that Petitioner received a flu vaccine intramuscularly in his right shoulder on October 25, 2019, in Oregon. *See,* e.g., Ex. 2; *see also* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Ex. 2; Section 11(c)(1)(E) (lack of prior civil award). As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA. Additionally, it is not disputed that Petitioner has established the six-month severity requirement. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement).

Based upon all of the above, Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## IV.    Damages

The parties have also briefed damages in this case, which is limited to a request for an actual pain and suffering award. Petitioner requests $65,000.00 for actual pain and suffering. ECF No. 32 at 1-2; ECF No. 36 at 1. Respondent proposes an award of "less than" Petitioner's request. ECF No. 34 at 12.

### A. Legal Standards for Damages Awards

In several recent decisions, I have discussed at length the legal standard to be considered in determining the appropriate amount of damages for SIRVA claims, based in part on their treatment in SPU. I fully adopt and hereby incorporate my prior discussion from Sections III and IV of *Leslie v. Sec'y Health & Hum. Servs.*, No. 18-0039V, 2021 WL 837139 (Fed. Cl. Spec. Mstr. Jan. 28, 2021) and *Johnson v. Sec'y of Health & Hum.*

*Servs.,* No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021), as well as Sections II and III of *Tjaden v. Sec'y of Health & Hum. Servs.,* No. 19-419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021). *See also Yodowitz v. Sec'y of Health & Hum. Servs.,* No. 21-370V, 2024 WL 4284926 (Fed. Cl. Spec. Mstr. Aug. 23, 2024) (discussing statistical data of compensation awarded in prior SIRVA cases to-date); *Boyle v. Sec'y of Health & Hum. Servs.,* No. 21-1257V, 2025 WL 1007393 (Fed. Cl. Spec. Mstr. Feb. 26, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[12]

## B. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult, with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, affidavits, witness declarations, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

This is a straightforward pain and suffering determination – with the parties disputing very little regarding Petitioner's compensable SIRVA-related treatment and the duration of his injury. *Compare* ECF No. 32 (Motion) at 24-25 (describing Petitioner's 10-month course of treatment including four PT sessions, an MRI, x-ray, one cortisone injection, orthopedic and PCP visits, with surgery being a recommended option), *with* ECF No. 34 (Response) at 11 (noting Petitioner delayed treatment for seven weeks, had four PT sessions, one steroid injection, and treated for a total of 10 months before declining

---

[12] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

surgery).

The filed record in this case establishes that Petitioner suffered a mild SIRVA overall. Particularly probative is evidence demonstrating Petitioner delayed seeking treatment for seven weeks post vaccination, underwent subsequent treatment with an x-ray and an MRI, participated in only four PT sessions over a one-month span, and received one cortisone injection – resulting in some lingering pain and effects following treatment. In addition, Petitioner's medical records contain descriptions of his pain on a ten-point scale, initially ranging from a 0-8/10 (with a current rating of 1/10) just two months post-vaccination on December 18, 2019, at the *beginning* of his care. *See* Ex. 3 at 13. When he reported severe pain rated at an 8/10 on July 29, 2020, it was only *after* he had completed PT and received a steroid injection, each failing to provide relief. *See* Ex. 4 at 24. But an MRI performed the same month revealed the presence of a comorbid (but unrelated – since it could not be caused by vaccination) complete rotator cuff tear – which could (at least partially) explain some of Petitioner's ongoing and more severe pain at that point. *See id.* at 38.

Additionally, Petitioner experienced diminished ROM, with some slight residual limitations in abduction at the conclusion of his vaccine-related care in August 2020. *See,* e.g., Ex. 3 at 13-14; Ex. 4 at 14, 26. I will note, however, that Petitioner's failure to exhibit reduced ROM or tenderness at his initial post-vaccination visit for vaccine-related complaints (on December 13, 2019), is somewhat inconsistent with his assertions in his affidavit, where he described "incredib[le]" tenderness and restricted ROM by this time – again speaking to the overall mildness of Petitioner's injury. *Compare* Ex. 1 at 31-32, *with* Ex. 2 ¶¶ 10-11.

More so, while I acknowledge record evidence that surgery was considered as a means to remedy his ongoing symptoms and limitations, and as a way to avoid modifying his movements in the future (e.g., Ex. 4 at 13, 27), I cannot heavily rely on this recommendation in justifying a higher award – since Petitioner chose to *forego* this treatment option. But I also credit that the reason Petitioner opted against this course of action was over concern of his other unrelated health conditions. It thus provides some corroborative support for the degree of severity of his injury.

Turning to the parties' cited comparable cases, Petitioner relies on four prior decisions in making his pain and suffering demand – *Magee v. Sec'y of Health & Hum. Servs.,* No. 18-185V, 2020 WL 5031971 (Fed. Cl. Spec. Mstr. July 21, 2020) (awarding $65,000.00 in pain and suffering); *Kuhn v. Sec'y of Health & Hum. Servs.,* No. 18-91V, 2020 WL 3750994 (Fed. Cl. Spec. Mstr. June 5, 2020) (awarding $67,500.00 in pain and suffering); *Morrison-Langehough v. Sec'y of Health & Hum. Servs.,* No. 19-1103V, 2022

WL 1863924 (Fed. Cl. Spec. Mstr. Apr. 14, 2022) (awarding $70,000.00 in pain and suffering); and *T.E. v. Sec'y of Health & Hum. Servs.,* No. 19-633V, 2021 WL 2935751 (Fed. Cl. Spec. Mstr. May 7, 2021) (awarding $70,000.00 in pain and suffering). Respondent, by contrast, unhelpfully provided *no* comparable cases (although he endeavored to distinguish those provided by Petitioner).

Petitioner's reliance on these cases does not advance Petitioner's argument for his full requested amount of $65,000.00. Indeed, as noted above, Petitioner's delay in seeking treatment is a factor that speaks to the ultimate amount of pain and suffering awarded. Petitioner here delayed seeking treatment for approximately seven weeks (49) days post vaccination, despite evident opportunity to have it treated in this timeframe. And the petitioners in his proposed comparable cases sought care much sooner than he did. For instance, the *Morrison-Langehough* petitioner delayed care the longest out of Petitioner's cited comparable cases: 29 days. *See* 2022 WL 1863924. Likewise, the *Magee* petitioner waited three weeks post vaccination; the *T.E.* petitioner 18 days; and the *Kuhn* petitioner sought care within just *eight days* of the subject vaccination. *See* 2020 WL 5031971; 2021 WL 2935751; 2020 WL 3750994. Moreover, only the *Morrison-Langehough* petitioner had any intervening visits before mentioning shoulder complaints (one versus Petitioner's four). 2022 WL 1863924, at *9.

Similarly, the petitioners in all of these cases received more treatment than Petitioner. For instance, Petitioner attended a total of only *four* PT sessions - a notably-low number of PT sessions compared to other SIRVA claims in the Program, and even lower than the purportedly-comparable petitioners. The *Morrison-Langehough* petitioner, for example, attended 12 total PT sessions. *See* 2022 WL 1863924. More so, the *T.E.* petitioner attended nine sessions; the *Magee* petitioner had seven visits; and the *Kuhn* petitioner attended five sessions over a one-month period – the closest to that of Petitioner's circumstances of PT (four sessions over an approximate one-month timeframe). *See* 2021 WL 2935751; 2020 WL 5031971; 2020 WL 3750994. In addition, the *Morrison-Langehough* and *Kuhn* petitioners had an objectively longer treatment course compared to Petitioner in this case (18 months - with the bulk of treatment in the first 11 months) and 11 months, respectively, versus Petitioner's 10-month course). *See* 2022 WL 1863924; 2020 WL 3750994. Petitioner's somewhat lesser treatment thus equates to a lower award than that awarded in his cited comparable cases.

Another factor that is considered in awarding pain and suffering is the effect of the injury on Petitioner's personal life. Here, while Petitioner's SIRVA undoubtedly made it more difficult for him to perform his job as a maintenance engineer (requiring lifting heavy objects), I note that Petitioner did not seek a claim for lost wages, nor did he describe with specificity the ways in which he was forced to modify his duties or otherwise explain the

other implications his injury had on his work. *See generally* Ex. 2. This personal factor will thus not be heavily weighed in awarding damages. At the same time, Petitioner credibly explained (and his partner corroborated) that Petitioner had lost the enjoyment of hunting and archery as a result of his vaccine-related injury. *See,* e.g., Ex. 2 ¶ 17; Ex. 10 ¶¶ 6-7. This factor will play a small role in the amount awarded for Petitioner's pain and suffering but does not marshal in favor of a *significantly* larger award.

Under such circumstances and considering the arguments presented by both parties, a review of the cites cases, and based on the record as a whole, I find that **$58,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case – a figure somewhat lower than what was awarded in the proposed comparable cases, since I conclude the degree of suffering herein was somewhat diminished in comparison.

### Conclusion

**In view of the evidence of record, I find that Petitioner is entitled to compensation.** I also find that, for all of the reasons discussed above and based on consideration of the record as a whole, **$58,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**

**Accordingly, Petitioner is awarded a lump sum of $58,000.00 (for actual pain and suffering) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).[13]

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[14]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[14] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.